## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-cr-00351-TNM** |
| **RYAN WILSON** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ryan Wilson to 78 months' incarceration, three years of supervised release, $2,000 in restitution, and a special assessment of $620.

### I.    INTRODUCTION

The defendant, Ryan Wilson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

After observing violent clashes on the West front of the Capitol, Wilson entered the tunnel adjacent to the Lower West Terrace of the Capitol where some of the worst violence on January 6 was already raging between rioters and police protecting the Capitol building. Undeterred, Wilson raised the level of violence in the tunnel. First, he joined in concerted "heave-ho" pushes with other rioters against the police line. Next, as he was pushing his way to the front lines of the rioters, he threw a water bottle at the police line, striking at least one officer. When he finally made his way to the front line of the rioters up against the police line, Wilson grabbed a long, PVC pipe and used it to violently attempt to spear police officers' heads. Wilson only ceased his violent attack and retreated from the tunnel after being pepper sprayed in the face by a police officer.

The government recommends that the Court sentence Wilson to 78 months of incarceration for his convictions. A 78-month sentence reflects the gravity of Wilson's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Wilson's Role in the January 6, 2021 Attack on the Capitol

Ryan Wilson violently participated in the January 6 attack on the Capitol. His crimes are documented through body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol.

Wilson travelled to Washington, D.C. from Oregon to attend the former President's

political rally at the Ellipse on January 6, 2021. Stip. ¶¶ 24-25 (ECF 30-1). After attending the rally, Wilson walked to Capitol grounds with the crowd (Stip. ¶¶ 27-28, 30), including his father, Duke Wilson.[2]

After arriving at the West front of the Capitol and observing violent clashes between police and rioters, Wilson and his father made their way to the tunnel area where some of the worst violence between rioters and police was then taking place on January 6. When Wilson and his father arrived at the tunnel at around 2:45 p.m., police officers were desperately defending the doors that led from the tunnel to the interior of the Capitol building against forced entry by a large group of rioters who were using all available means to breach the police line. Despite witnessing the violence between police and rioters in the tunnel, Wilson made the decision to enter the tunnel at around 2:56 p.m.



*Gov. Exhibit 2C – Ryan Wilson (red) entering tunnel at 2:56 p.m.*

Shortly after entering the tunnel, Wilson joined other rioters who were engaged in coordinated "heave ho" pushes against the police line. Two minutes after entering the tunnel, at

---

[2] Duke Wilson pleaded guilty to assault and obstruction of justice and was sentenced to prison for his conduct on January 6, 2021 *See U.S. v. Duke Wilson*, No. 1:21-cr-00345-RCL.

around 2:58 p.m. and while making his way to the front lines of the rioters who were face to face with officers in the police line, Wilson pulled a water bottle out of his pocket and threw it at the police line.[3]



*Gov. Exhibit 6B – Ryan Wilson (red) throwing water bottle at police line at 2:58 p.m.*

By approximately 3:00 p.m., Wilson had made his way to the front lines of the rioters in the tunnel where violent altercations between police and rioters, including Duke Wilson, were occurring. Amid this violence, Wilson grabbed a PVC pipe that other rioters were passing towards the police line. After grabbing the pipe, Wilson violently thrusted it at the heads of several police officers,[4] including former MPD Officer Cameron Wilhoit, who testified at trial, and former U.S. Capitol Police Sergeant Aquilino Gonell, who blocked Wilson's attempted spear assault with his

---

[3] *See* Gov. Exhibits 2, 6. Government Exhibits 15 and 16 show that the water bottle that Wilson threw made contact with the police line approximately two minutes and fifty seconds prior to Wilson's pipe assault. *See* Gov. Exhibits 15 (water bottle at 7:06-7:07 mark); 16 (same). *See also* Gov. Exhibits 2, 6 (water bottle and pipe assaults approximately two minutes and fifty seconds apart).

[4] *See* Gov. Exhibits 2, 3, 6, 7, 9, 10.

shield.



*Gov. Exhibit 7 – Ryan Wilson (red) thrusting pipe at officers at 3:00 p.m.*



*Gov. Exhibit 9A – Ryan Wilson (red) thrusting pipe at officers at 3:00 p.m.*



*Gov. Exhibit 3C – Body Worn Camera showing Ryan Wilson (red) thrusting pipe at former MPD Officer Carlton Wilhoit's Head at 3:00 p.m.*

As Wilson was assaulting police with the pipe, one of the officers fired pepper sprayed at Wilson. *See* Gov. Exhibit 9 (pepper spray at 0:31 mark). Wilson immediately retreated from the tunnel to wash out his eyes. After exiting the tunnel, Wilson remained on Capitol grounds to recover from the pepper spray and reunite with his father, Duke Wilson.



*Gov. Exhibit 8A –Wilson (red) receiving water on face after retreating from tunnel.*

### C.    Wilson's Pre-Trial Interview with the FBI

On August 21, 2023, Wilson was interviewed at the Federal Bureau of Investigation's Portland Office. Wilson explained that his father, Duke Wilson, wanted to go to the political rally at the Ellipse on January 6, 2021, and they travelled together from Oregon. After attending the rally, Wilson and his father walked to the Capitol. Wilson noticed something going on in the tunnel area of the Capitol, and he and his father went to see what was happening. Wilson knew there were police officers inside the tunnel when he entered and acknowledged that he was interfering with their official duties with his conduct. He claimed that he did not remember throwing the water bottle and claimed to have blacked out in the tunnel due to a medical condition. Wilson acknowledged grabbing the PVC pipe and using it against police officers. He stated that he greatly regretted being there and was embarrassed for his actions on January 6.

## III.    THE CHARGES AND PLEA AGREEMENT

On October 4, 2023, a federal grand jury returned an indictment charging Wilson with eight

counts:

- Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3) (Count One)

- Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. §§ 111(a)(1) (Count Two)

- Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon or Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b) (Count Three)

- Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count Four)

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Count Five)

- Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Count Six)

- Disorderly Conduct on Capitol Grounds, 40 U.S.C. § 5104(e)(2)(D) (Count Seven)

- Act of Physical Violence in the Capitol Grounds or Building, 40 U.S.C. § 5104(e)(2)(F) (Count Eight)

On October 10, 2024, this Court convicted Wilson on all counts following a bench trial.

## IV.    STATUTORY PENALTIES

Wilson now faces sentencing on all eight charges.

The statutory maximum penalties for Wilson's crimes are set forth in PSR ¶¶ 112-19, 126-

28, 135-36, and 144-47.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). That Guidelines analysis follows:

### A.  Analysis for each count

#### 1.  Count One: 18 U.S.C. § 231(a)(3), Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder

Because there is no applicable Chapter Two Guideline for Count One in the Statutory Appendix, use "the most analogous guideline." *See* U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. §2A2.4(a). |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. §2A2.4(b)(1): "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by **3** levels."<br><br>The Court found that Wilson used a dangerous weapon (the PVC pipe) that made contact with an officer's shield. |
| Cross-Reference | | Pursuant to U.S.S.G. §2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." The Application Notes to Section 2A2.2, in turn, define "aggravated assault" as a "felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; or (D) an intent to commit another felony."  U.S.S.G. §2A2.2 cmt. n.1. Wilson's conduct constituted aggravated assault. Wilson used a dangerous weapon (the PVC pipe) to assault the officers with the intent to cause bodily injury. |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2(a) |
| Special offense characteristic | +4 | U.S.S.G. §2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used."<br><br>The Court found that Wilson used a dangerous weapon (the PVC pipe). |

9

| Adjustment | +6 | U.S.S.G. §3A1.2(a)-(c): A +6 level enhancement is added if one of the following applies. First, the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person). U.S.S.G. §3A1.2(a)-(b). Second, "in a manner creating a substantial risk of serious bodily injury, the defendant, . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense." U.S.S.G. §3A1.2(c)(1).<br><br>Here, the +6 enhancement applies under either scenario. First, the officers were clearly identified as police officers. At the time of the offense, they were wearing full USCP and MPD uniforms and standing with a group of similarly dressed officers guarding the tunnel entrance. The evidence—including Wilson watching as waves of rioters assaulted the police—shows that his assaultive behavior toward the officers was motivated by their status as officers and their attempts to defend the Capitol and to stop rioters from breaching police lines and further enter restricted Capitol grounds. Second, as to (c)(1), Wilson knew that the officers were law enforcement officers and created a substantial risk of serious bodily injury when he thrust a PVC pipe at their heads two times. |
| Total | **24** | |

## 2. Count Two: 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers

The Statutory Index references two guidelines for 18 U.S.C. § 111: U.S.S.G. §§2A2.2 (Aggravated Assault) and 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* § 1B1.2 N.1. Here, that is U.S.S.G. §2A2.2, "Aggravated Assault" because Count Two (the water bottle felonious assault) was committed with intent to commit another felony, that is, Count One, Civil Disorder.

| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) |
| Adjustment | +6 | U.S.S.G. §3A1.2(a), (b).<br><br>*See* Count One, above. |

| Total | **20** | |
|-------|--------|--|

### 3. Count Three: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon

The Statutory Index references two guidelines for 18 U.S.C. § 111: U.S.S.G. §§2A2.2 (Aggravated Assault) and 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* § 1B1.2 n.1. Here, that is U.S.S.G. §2A2.2, "Aggravated Assault" because Count Three (assault with PVC pipe) was a felonious assault with a dangerous weapon with intent to cause bodily injury and additionally was an assault committed with the intent to commit another felony, that is, Count One (Civil Disorder).

| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) |
|--------------------|----|--------------------| 
| Special offense characteristic | +4 | U.S.S.G. §2A2.2(b)(2)(B).<br><br>*See* Count One, above. |
| Specific Offense Characteristic | +2 | U.S.S.G. §2A2.2(b)(7): "the defendant was convicted under 18 U.S.C. § 111(b)." |
| Adjustment | +6 | U.S.S.G. §3A1.2(a), (b).<br><br>*See* Count One, above. |
| Total | **26** | |

### 4. Count Four: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---------------------|---|--------------------|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): If the trespass occurred "at any restricted building or grounds," add **2** levels.<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(2): If the defendant possessed a dangerous weapon, add **2** levels. |
| Cross-Reference | | U.S.S.G. §2B2.3(c)(1): If the offense was |

| | | committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above.<br><br>Wilson remained the restricted area of the Capitol with the intent of interfering with law enforcement during a civil disorder. The substantive offense is thus Count Three (18 U.S.C. §§ 111(a)(1) and (b)), and the base offense level for that offense should be applied. |
|---|---|---|
| Base Offense Level with Specific Offense Characteristics(adjusted) (from Count Three) | 14 | U.S.S.G. §2A2.2(a) |
| Special offense characteristic | +4 | U.S.S.G. §2A2.2(b)(2)(B).<br><br>*See* Count One, above. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(c).<br><br>*See* Count One, above. |
| **Total** | **24** | |

5.  **Count Five: Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A)**

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Special offense characteristic | +3 | U.S.S.G. §2A2.4(b)(1)(A).<br><br>*See* Count One, above. |
| Cross reference | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2<br><br>*See* Count One, above. |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) |
| Special offense characteristic | +4 | U.S.S.G. §2A2.2(b)(2)(B).<br><br>*See* Count One, above. |

| | | |
|---|---|---|
| Adjustment | +6 | U.S.S.G. §3A1.2(c). *See* Count One, above. |
| **Total** | **24** | |

**6. Count Six: Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A).**

| | | |
|---|---|---|
| Base offense level | 10 | U.S.S.G. §2A2.4. |
| Specific Offense Characteristics | +3 | U.S.S.G. §2A2.4(b)(1)(A). *See* Count One, above. |
| Cross-Reference | | U.S.S.G. §2A2.4(c) – if the conduct constituted aggravated assault, apply §2A2.2 *See* Count One, above. |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a). |
| Special offense characteristic | +4 | U.S.S.G. §2A2.2(b)(2)(B). *See* Count One, above. |
| Adjustment | +6 | U.S.S.G. §3A1.2(a)-(b). *See* Count One, above. |
| **Total** | **26** | |

**7. Count Seven: Disorderly Conduct on Capitol Grounds, 40 U.S.C. § 5104(e)(2)(D); and Count Eight: Act of Physical Violence in the Capitol Grounds or Building, 40 U.S.C. § 5104(e)(2)(F)**

| | | |
|---|---|---|
| Base Offense Level: | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |

**B. Grouping**

Under U.S.S.G. §3D1.2, "closely related counts" group. Wilson's eight counts of

13

conviction form two groups:

> Group One consists of Counts One and Three, because they involve the same victims and similar acts "connected by a common criminal objective" of assaulting and obstructing officers on the Tunnel with a pipe. U.S.S.G. §3D1.2(b). Counts Four, Five, and Six involve a different victim, Congress, but because the offense levels for these counts are enhanced by the specific offense characteristic relating to the same dangerous weapon, they group with Count One and Three pursuant to U.S.S.G. §3D1.2(c). The highest offense level for this group is 26.

> Group Two consists of Count Two (the water bottle assault) because it involves a different victim and a different act. Unlike the other Counts in Group One, Count Two is not enhanced by the dangerous weapon specific offense characteristic. The highest offense level for this group is 20.

> Counts Seven and Eight are not grouped, because the Guidelines do not apply to them.

> One level is added to the total offense level after application of §3D1.4. PSR ¶ 55.

### C.  No Reduction under U.S.S.G. §4C1.1

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. §4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case, because of Wilson's personal use of violence and his possession and use of a dangerous weapon as broadly defined in §1B1.1 cmt. n.1. *See* U.S.S.G. §4C1.1(a)(3), (7).

### D.  Guideline Range

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 65. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 27, Wilson's Guidelines imprisonment range is 70 to 87 months' imprisonment.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Wilson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Wilson was a violent actor on January 6. He entered the tunnel with the intent of assaulting police officers. Shortly after entering the tunnel, he joined concerted pushes against the police line. Then, he threw a water bottle, which struck an officer in the police line. Finally, he grabbed a pipe and used it to attempt to spear police officers in their heads. He only ceased his violent conduct after getting pepper sprayed in the face. The nature and circumstances of Wilson's offense[s] were of the utmost seriousness, and fully support the government's recommended sentence of 78 months' incarceration.

### B.    The History and Characteristics of the Defendant

Prior to his arrest in this case, Wilson was a wheat farmer and equipment operator in Oregon, where he lived with his wife and two children. PSR ¶¶ 74, 101. Wilson was in a serious car accident in 2013 or 2014 and has a host of medical conditions. PSR ¶¶ 78-88. While such medical conditions may often act as a mitigating factor, those same conditions existed when he violently attacked police officers on January 6, 2021. They should not now serve as mitigators, respectfully. Furthermore, the Bureau of Prisons is equipped to receive and adequately treat individuals with serious medical conditions.

15

In 2006, Wilson was convicted of two misdemeanor counts of Theft and Criminal Mischief after he stole a case of Red Bull from a tavern in Bend, Oregon. PSR ¶ 64. In addition to the theft, Wilson went into the tavern's computer room and tampered with a security computer containing an image of him. *Id*. Wilson also damaged the desk drawer and knocked the tavern's computer monitors over. *Id*. When interviewed, Wilson stated it was not his intention to steal anything and he was just mad at the bouncers because they were "jerks." *Id*.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Wilson's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Wilson's violent crimes were acts of politically motivated violence. Upset about an election result, Wilson violently assaulted police

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

officers protecting the Capitol building. Although Wilson previously expressed some remorse for his actions in a pre-trial interview, those statements were made during plea negotiations with the government. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Wilson's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly considering the severity of his assault on January 6.

     **E.    The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

17

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

18

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Ryan Wilson's father, Duke Wilson, was sentenced to the high-end of his guidelines range, 51 months' incarceration, by Judge Lamberth for his conduct in the tunnel. *U.S. v. Duke Wilson*, 21-cr-345. Duke Wilson was in the same area of the tunnel at the same time as Ryan Wilson. Duke Wilson fought with police on the front lines of rioters against the police line, including attempting to punch and shove them, take their shields, and throw a PVC pipe at them. While Duke Wilson's conduct also involved a PVC pipe, Duke Wilson tossed a pipe at the police line while Ryan Wilson violently thrusted it at the heads of the officers with a clear and obvious intent to injure them. *See* Gov. Exhibit 16 (Duke Wilson's conduct starting at 9:30 mark and pipe toss at 10:05 mark). Unlike

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Ryan Wilson, Duke Wilson pleaded guilty to 18 U.S.C. §§ 111(a)(1) and 1512(c)(2) and had a guidelines range of 41-51 months. In contrast, Ryan Wilson was convicted of 111(a)(1) *and* (b), as well as seven other offenses, after trial and has a higher guidelines range of 70-87 months. Like the Duke Wilson case, Ryan Wilson's violent conduct in the tunnel on January 6 in this case warrants a within guidelines sentence. The government is requesting a middle-of-the-guidelines sentence of 78 months' incarceration.

In *U.S. v. McCaughey et al.*, 21-cr-40, the defendant was convicted of 18 U.S.C. § 111(a)(1) and (b), and other offenses, after a bench trial for his actions in the tunnel on January 6. McCaughey, like Wilson, participated in concerted "heave ho" pushes against the police line in the tunnel and assaulted a defenseless U.S. Capitol Police Officer, Daniel Hodges, with a stolen police shield while Hodges was trapped in a doorway. McCaughey was subject to a higher offense level and Guidelines range than Wilson because he caused serious bodily harm to Officer Hodges. McCaughey also used the stolen police shield to assault multiple officers over a longer period of time than Wilson. This Court sentenced McCaughey to 90 months' incarceration. McCaughey's case warrants more significant treatment but should not ultimately detract from the government's recommendation here. Ultimately, the Court's significant knowledge of that case, coupled with the aggravating and mitigating factors present, will nonetheless help serve as a more severe comparator in this context.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because Wilson was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes,

21

the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

"reasoned judgment.").

More specifically, the Court should require Wilson to pay $2,000 in restitution for his convictions. This amount fairly reflects Wilson's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   FINE

Wilson's felony convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. §5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. §§5E1.2(a), (e) (2023). Here, after analyzing Wilson's financial resources, has concluded that "it does not appear that he has the resources to play a fine." PSR ¶ 111.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months' incarceration, three years of supervised release, $2,000 in restitution, and a special assessment of $620.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     _s/ Andrew J. Tessman_
ANDREW J. TESSMAN
Assistant United States Attorney
WV Bar No. 13734
United States Attorney's Office
District of Columbia
(304) 345-2200
Andrew.Tessman@usdoj.gov

24